1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                          DISTRICT OF IDAHO

10                          ----oo0oo----

11

12   PLATFORM ARCHITECTURE & DESIGN,        No. 1:20-cv-00012-WBS
     PLLC,
13
                    Plaintiff,
14                                           MEMORANDUM AND ORDER RE:
            v.                               DEFENDANTS' MOTION TO DISMISS
15
     JAMES L. ESCOBAR; MARLA CARSON;
16   NEUDESIGN ARCHITECTURE, LLC;
     TYLER ROBERTS; HOLLEY DRYDEN;
17   INFINITY & ROBERTS, LLC;
     JONATHAN KLUTNICK; JAMES J.
18   KLUTNICK; DOES 1-5; and ABC
     COMPANIES 1-5,
19
                    Defendants.
20

21                          ----oo0oo----

22

23           Plaintiff Platform Architecture & Design PLLC

24   ("Platform") filed this action against defendants James L.

25   Escobar, Marla Carson, neUdesign Architecture, LLC, Tyler

26   Roberts, Holley Dryden, Infinity & Roberts, LLC, Jonathan

27   Klutnick, James J. Klutnick, Does 1 through 5, and ABC Companies

28   1 through 5, arising from defendants' alleged unlawful copying

                                   1

1   and use of plaintiff's architectural design plans.  Before the

2   court is defendants' motion to dismiss plaintiff's Second Amended

3   Complaint.  (Docket No. 40)

4   I.   Relevant Allegations

5        A.   Plaintiff's Design Plans

6            Plaintiff Platform is an active Idaho professional

7   limited liability company.  (Second Amended Complaint ("SAC") ¶ 1

8   (Docket No. 38).)   Catherine M. Sewell ("Sewell") is Platform's

9   sole employee, principal, manager, and owner of all membership

10  interest in the company.  (Id.)   In or around late 2015 and early

11  2016, Sewell met with Platform's client to discuss the creation

12  of original plans for a proposed multifamily residential

13  development to be located at 6230 W. State Street, in Boise,

14  Idaho, real property then-owned by Platform's client (the

15  "Property").  (Id. ¶ 90.)

16           The property was a blank slate -- a trapezoidal lot 150

17  feet wide, 553 feet long at the eastern boundary and 533 feet

18  long at the western boundary, with wide variation of street

19  access available.  (Id. ¶ 92; see also id. Ex. H.)   The

20  applicable zoning regulations allow up to 80 residential units on

21  the property.  (Id. ¶ 93.)   Under the applicable zoning code, the

22  property may be used for a variety of commercial or residential

23  purposes.  (Id. ¶ 95.)

24           The starting point for creation of the plan drawings

25  was the concept of a multi-unit residential development that

26  would foster community among residents while including a mix of

27  different unit types.  (Id. ¶ 97.)   In or around February 2016,

28  Sewell provided Platform's client with several rough sketches of

1   different possible concepts.  (Id. ¶ 98-99; id., Ex. G.)  Each of
2   the concept sketches was created to fit the specific size and
3   shape of the property.  (Id. ¶ 100.)  In drafting the plan
4   drawings, plaintiff considered desirable shapes, sizes, geometric
5   configurations, the numerous options regarding configuration and
6   number of units, number of buildings, number of parking spaces,
7   and shared spaces, the desire to foster community, and other
8   elements.  (Id. ¶ 91.)  Platform's client settled on Concept 'B'
9   (id.  ¶ 104), which included a unique configuration of buildings,
10  landscaped spaces, and parking spaces, with parking on the east
11  side of the property and between groupings of buildings, open
12  space between the grouped buildings, and a total of 54-63
13  potential units (id. ¶ 102).  Concept 'B' also included an
14  unusual configuration of residential units in the three-story
15  buildings: the ground floors of the buildings would comprise
16  smaller units, while the second and third floors together would
17  comprise larger, two-story apartment units.  (Id. ¶ 103.)

18      Without use of any previously existing designs (id. ¶
19  107), Sewell drafted the plan drawings (id. ¶ 14).  These are
20  copyrighted visual material under registration no. VAu001379620.
21  (Id. ¶ 15.)  Platform submitted the plan drawings to the City of
22  Boise ("City") Planning & Development Services Department as part
23  of a request for a conditional use permit obtained for a client.
24  (Id.  ¶ 18.)  After the City approved the permit, Platform's
25  client decided to sell the Property rather than proceed with the
26  development.  (Id. ¶ 29.)

27      B.   Defendants' Alleged Copying of Plaintiff's Design Plans
28          At the end of 2016, Idaho real estate agent Tyler

3

Roberts ("Roberts") contacted Sewell, stated that he was a real estate agent looking into the Property for a purchaser, and asked for information about the planned project, including specific questions regarding the possibility of increasing parking and trash enclosures.  (Id. ¶ 34.)  In response to requests from Roberts, Sewell provided copies of the plan drawings and other documents to Roberts.  (Id. ¶ 35.)  On January 31, 2017, Sewell sent an email to Roberts mentioning the documents Sewell sent, expressing that Sewell had not seen progress on the project on the Property, and reminding Roberts that the entitlement plans Sewell sent "cannot be used further for this project without [Sewell's] or Platform Architecture Design's authorization."  (Id. ¶ 36.)

Approximately two weeks after Sewell emailed Roberts, Platform's client sold the Property to defendant Dryden.  (Id. ¶¶ 41, 42.)  Plaintiff believes that Dryden is a close personal associate of Roberts and was a straw buyer.  (Id. ¶ 43.)  After the purchase, Dryden and Roberts worked in coordination with defendants James Escobar, Marla Carson, and neUdesign to proceed with the development plans.  (Id. ¶ 44.)  Escobar and Carson created and submitted architectural drawings based on Platform's plan drawings.  (Id. ¶ 49.)  Indeed, in a telephone conversation with Sewell, Escobar admitted to Sewell that Platform's plan drawings had been used by neUdesign as the basis for its plans.  (Id. ¶ 56.)  neUdesign's drawings were thus copies of Platform's plan drawings, with only minor revisions.  (Id. ¶ 50.)  By copying Platform's plan drawings, defendants avoided the expense of commencing new plans or paying Platform for a license to use

1    its copyrighted work.  (Id. ¶ 51.)

2         C.   The Klutnick Defendants

3              On October 22, 2018, defendant Dryden executed a deed

4    granting ownership of the Property to Infinity & Roberts, LLC.

5    (Id. ¶ 61.)  Roberts is one of the two members of Infinity &

6    Roberts, LLC.  (Id. ¶ 62.)  On October 24, 2018, two days after

7    its transfer to Infinity & Roberts, LLC, Roberts listed the

8    property for sale and marketed it online using neUdesign's plans.

9    (Id. ¶¶ 63-64.)  On January 15, 2019, after less than three

10   months on the market, Infinity & Roberts, LLC sold the Property

11   to a new purchaser, whom plaintiff believes to be a limited

12   liability company formed at the direction of and on behalf of

13   defendants Jonathan Klutnick and James Klutnick (collectively,

14   the "Klutnick defendants").  (Id. ¶ 65-66.)  Klutnick has worked

15   in concert with neUdesign, Carson, and Escobar to proceed with

16   and to expand the project.  (Id. ¶ 68.)  Plaintiff believes

17   Klutnick continues to use neUdesign's plans despite knowing of

18   plaintiff's copyright claims.  (Id. ¶ 69.)

19             In July 2019, defendant neUdesign, acting on behalf of

20   defendant Jonathan Klutnick, wrote to the City of Boise

21   requesting approval "to construct a phase II of a multifamily

22   project" on the Property.  (Id. ¶ 72-74.)  The phase II site plan

23   was submitted to the City that same month.  (Id. ¶ 77.)  The

24   phase II plans incorporated and included the phase I designs

25   based on plaintiff's plan drawings and are therefore the result

26   of the neUdesign defendants and their client, Jonathan Klutnick,

27   copying plaintiff's plan drawings.  (Id. ¶ 79-82.)

28             Plaintiff believes the foregoing acts were done at the

express direction and approval of the Klutnick defendants, as
they supervised the neUdesign defendants' work.  (Id. ¶¶ 83, 88.)

     D.   Procedural Posture

       Plaintiff filed this action alleging one claim for
copyright infringement, pursuant to 17 U.S.C. §§ 101, et seq.
The governing complaint is plaintiff's Second Amended Complaint.
Defendant now moves to dismiss for failure to state a claim under
Federal Rule of Civil Procedure 12(b)(6).

II.  Legal Standard

       On a Rule 12(b)(6) motion, the inquiry before the court
is whether, accepting the well-pleaded allegations in the
complaint as true and drawing all reasonable inferences in the
plaintiff's favor, the plaintiff has stated a claim to relief
that is plausible on its face.  See Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009).  The court, however, is "not required to accept
as true allegations . . . that are merely conclusory, unwarranted
deductions of fact, or unreasonable inferences."  Seven Arts
Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251,
1254 (9th Cir. 2013).  "The plausibility standard is not akin to
a 'probability requirement,' but it asks for more than a sheer
possibility that a defendant has acted unlawfully."  Id.

III. Discussion

       To state a claim for copyright infringement, plaintiff
must allege: (1) "that he owns a valid copyright" in his
architectural design, and (2) that defendant "copied protected
aspects" of plaintiff's expression of the design.  Rentmeester v.
Nike, Inc., 883 F.3d 1111, 1116-17 (9th Cir. 2018) (citing Feist
Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991);

1   Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. 1990)).

2           The second element has two distinct components:

3   "copying" and "unlawful appropriation."  Id. at 1117 (citing Sid

4   & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562

5   F.2d 1157, 1164-65 (9th Cir. 1977)).  "Proof of copying by the

6   defendant is necessary because independent creation is a complete

7   defense to copyright infringement."  Id.  Further, "[p]roof of

8   unlawful appropriation -- that is, illicit copying -- is

9   necessary because copyright law does not forbid all copying."

10  Id.

11          A defendant is liable where the copying of plaintiff's

12  protected expression rendered the two works "substantially

13  similar."  Id.  The term means different things under the

14  "copying" and "unlawful appropriation" components of the second

15  element.  Id.  "To prove copying, the similarities between the

16  two works need not be extensive, and they need not involve

17  protected elements of the plaintiff's work.  They just need to be

18  similarities one would not expect to arise if the two works had

19  been created independently."  Id.  By contrast, to prove

20  unlawful appropriation, "the similarities between the two works

21  must be 'substantial' and they must involve protected elements of

22  the plaintiff's work."  Id.

23          Defendants do not contest that plaintiff owns a valid

24  patent, but contest both components of the second element.  They

25  argue, first, that plaintiff cannot allege unlawful appropriation

26  because the designs are not substantially similar as a matter of

27  law, and, second, that the complaint fails to allege that the

28  Klutnick defendants copied plaintiff's design.  Defendants do not

7

1    dispute that the complaint sufficiently alleges that all other

2    defendants copied plaintiff's design.  The court addresses each

3    argument in turn.

4              A.   Unlawful Appropriation

5              To determine whether works are substantially similar,

6    the court applies a two-part analysis consisting of an "extrinsic

7    test" and an "intrinsic test."  Rentmeester, 883 F.3d at 1118.

8    "The extrinsic test assesses the objective similarities of the

9    two works, focusing only on the protectable elements of the

10   plaintiff's expression."  Id. (citing Cavalier v. Random House,

11   Inc., 297 F.3d 815, 822 (9th Cir. 2002)).  "The intrinsic test

12   requires a more holistic, subjective comparison of the works to

13   determine whether they are substantially similar in 'total

14   concept and feel.'"  Id.  Although a plaintiff must prove

15   substantial similarity under both tests to prevail, "only the

16   extrinsic test's application may be decided by the court as a

17   matter of law."  Id.; see also Williams v. Gaye, 895 F.3d 1106,

18   1119 (9th Cir. 2018) ("[T]he intrinsic test is reserved

19   exclusively for the trier of fact.").  The parties do not dispute

20   that such a determination is appropriate on a motion to dismiss.

21   See Rentmeester, 883 F.3d at 1123 (quoting Christianson v. West

22   Publishing Co., 149 F.2d 202, 203 (9th Cir. 1945); see also Peter

23   F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64

24   (2d Cir. 2010) ("If . . . the district court determines that the

25   two works are 'not substantially similar as a matter of law,' the

26   district court can properly conclude that the plaintiff's

27   complaint, together with the works incorporated therein, do not

28   'plausibly give rise to an entitlement to relief.'").  The court

therefore evaluates the works under the extrinsic test only.

To apply the extrinsic test, first, "the copyright holder must identify the concrete elements which are similar." Express, LLC v. Fetish Grp., Inc., 424 F. Supp. 2d 1211, 1228 (C.D. Cal. 2006) (citing Apple Comput., Inc. v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994)). "Second, the court must determine whether the allegedly similar elements are protected by copyright." Id.; see also Rentmeester, 883 F.3d at 1118 ("[T]he court must 'filter out' the unprotectable elements of the plaintiff's work."). "Third, the court must define the scope of the plaintiff's copyright—-i.e., whether it is entitled to broad or thin protection," id., in order to establish the degree of overlap necessary to deem the works substantially similar.

### 1.   Similar Elements Identified

Plaintiff alleges that the following features in the neUdesign defendants' work are identical or nearly identical to those in Platform's architectural work:

(1)  The spacing and composition of the buildings, parking, and open space;

(2)  The angle and slopes of the roofs, the proportions of vertical and horizontal elements, the trapezoidal shapes of interior walkways and landscape areas, and overall arrangement of spaces and structures;

(3)  The number of units, orientation of units, and arrangement of structures, open spaces' parking and other amenities is nearly identical;

(4)  The use, location, proportion and spacing of balconies and other elements;

1    (5)   The configuration of the mix of units, with smaller

2    ground floor units, and larger two-story units on the combined

3    second and third floors.

4    (Id. ¶ 110.)

5         2.   Identification of Protectable Elements

6              a.   Legal Standard

7         The Copyright Act ("the Act") grants copyright

8    protection to architectural works.  17 U.S.C. § 101.  An

9    "architectural work" is "the design of a building . . . including

10   a building, architectural plans, or drawings."  17 U.S.C. § 101.

11   "The work includes the overall form as well as the arrangement

12   and composition of spaces and elements in the design, but does

13   not include individual standard features,"  id., such as "common

14   windows, doors, and other staple building components," H.R.Rep.

15   No. 101-735, at 6949 (1990).  "The phrase 'arrangement and

16   composition of spaces and elements' recognizes that: (1)

17   creativity in architecture frequently takes the form of a

18   selection, coordination, or arrangement of unprotectible elements

19   into an original, protectible whole; (2) an architect may

20   incorporate new, protectible design elements into otherwise

21   standard, unprotectible building features; and (3) interior

22   architecture may be protected."  Id.; see also id. (The Act does

23   not intend to protect "pragmatic, constructional, and technical

24   requirements.").  "Accordingly, while individual standard

25   features and architectural elements classifiable as ideas or

26   concepts are not themselves copyrightable, an architect's

27   original combination or arrangement of such elements may be."

28   Thomson v. HMC Grp., No. CV 13-3273 DMG (VBKx), 2015 WL 11256775,

at *10 (C.D. Cal. Oct. 29, 2015) (quoting Intervest Const., Inc. v. Canterbury Estate Homes, Inc., 554 F.3d 914, 919 (11th Cir. 2008)).

"Constraints on protectable expression in architectural works include the merger doctrine, market demands, building codes and zoning requirements, functional demands, the physical site and environment, budgetary constraints and available technology." Id. (quoting Dream Custom Homes, Inc. v. Modern Day Const., Inc., 773 F. Supp. 2d 1288, 1300 (M.D. Fla. 2011), aff'd, 476 F. App'x 190 (11th Cir. 2012)).  Further, other courts have found that unprotectible elements of architectural works include, but are not limited to:

> (1) Standard configurations of spaces; (2) individual standard features, such as windows, doors, and other staple building components; (3) market expectations; (4) any design elements attributable to building codes, topography, structures that already exist on the construction site, or engineering necessity; (5) generalized notions of where to place functional elements, how to route the flow of traffic, and methods of construction; (6) design parameters, described as "constraints placed on an architect by the way her client plans to use the building"; and (7) features that are essential or common to the architectural style within which the builder designed the structure[.]

Id. at *10 (quoting Buttner v. RD Palmer Enters., Inc., No. 5:13-CV-0342 LEK/ATB, 2015 WL 1472084, at *7 (N.D.N.Y. Mar. 31, 2015)).

The "ideas" and "concepts" used in plaintiff's work are also not protectible.  Rentmeester, 883 F.3d at 1117.  To infringe, a defendant must instead copy "plaintiff's expression of those ideas or concepts."  Id.

       b.   Application

Defendants argue that the features plaintiff identifies

11

are common and generalized concepts and ideas that are not protectable under the Act.  (Mot. at 9.)  For that proposition, defendants cite Attia v. Society of New York Hospital, 201 F.3d 50, 52 (2d Cir. 1999), and Peter F. Gaito Architecture, LLC v. Simone Development Corp., 602 F.3d 57, 66 (2d Cir. 2010).  For the following reasons, the court finds these cases inapplicable and instead concludes that the features defendant allegedly copied jointly constitute the kind of "overall form as well as the arrangement and composition of spaces and elements in the design" that the Act intended to protect.

In Attia, hospital officials sought to expand and modernize the hospital's facilities, which are located at the edge of the East River in Manhattan.  201 F.3d 50, 52.  The hospital retained plaintiff to devise a plan for the modernization, and plaintiff submitted "architectural drawings and sketches" of plaintiff's concept, which the hospital liked. Id.  After the relationship between plaintiff and the hospital soured, the hospital initiated a competition to select the architect for its modernization plan.  Id.  The semi-finalists "were instructed by the Hospital to submit modernization proposals tailored to a '[m]ajor new construction on air rights over the F.D.R. Drive with connections to renovated existing facilities.'"  Id.  Upon seeing the winning design, plaintiff filed suit for copyright infringement.  Id.  The Attia plaintiff alleged that the following features were unlawfully copied by the defendant: the placement of a new structure on the F.D.R. Drive, use of a 3-story high truss to transfer the weight of the new building, integration of the new structure with pre-existing

12

facilities by aligning the floor heights and corridors, insertion of a connecting roadway to make a continuous traffic loop through the hospital complex, and proposed new placements for various hospital services and functions.  The court found that these features were not protectible because "these [were] no more than rough ideas of general nature [and were] barely a first step toward the realization of a plan."  Id.

Attia is distinguishable, however.  The crux of the Attia court's decision was the fact that plaintiff's drawings were "preliminary" and "conceptual."  Id. at 56.  The Attia plaintiff himself stated that his report "[was] not meant to suggest a specific configuration or functional plan" and instead merely "suggest[ed] an idea."  Id.  Plaintiff here, by contrast, is suing defendant for the copying of "final Plan Drawings." (SAC ¶ 108.)  Indeed, the Attia court distinguished the facts in front of it from those in cases, like the present matter, involving "drawings that were sufficiently detailed to enable construction."  Id. at 56.

Further, although the Attia court does not explicitly discuss the constraints on protectable expression in architectural works listed above, several of those constraints make a finding of unprotectibility appropriate in Attia and inappropriate here.  First, the hospital's specific demands limited the creativity and originality of plaintiff's designs. The hospital explicitly prescribed the location of the new building.  "Constraints placed on an architect by the way her client plans to use the building do not originate with the architect."  Zalewski v. Cicero Builder Dev., Inc., 754 F.3d 95,

106 (2d Cir. 2014).  "Any design choices made at the client's express request therefore cannot be considered an architect's original or creative design."  Thomson, 2015 WL 11256775, at *11. By contrast, here, the two design plans were allegedly created for different clients and it does not appear from the allegations of the SAC that the architects were subject to common instructions.  Plaintiff's design therefore was plausibly a product of the architect's creativity and imagination as plaintiff alleges (id. ¶ 107), rather than the pure functional demand of the project.

Second, the Attia architects had to meet specific functional demands: the expansion and modernization of an existent hospital.  Ideas, concepts, or plans to connect the existing hospital building to the new hospital building hardly constitute creativity since "expansion" denotes a relationship to the older building.  Here, on the other hand, based on the allegations, the pictures of the site, and defendants' silence on the issue, the court cannot infer more than a general instruction on the clients' part to build a multifamily residential development.  Such a general instruction renders unprotectible only "features that are essential or common" to a multifamily residential development.

Third, in Attia, related to the natural inclination to connect the two buildings, it was necessary that the architects use the physical site and environment in a way that made that connection possible.  The choice to place the building over the F.D.R. Drive therefore approaches the "pragmatic, constructional, and technical requirements" that the Act does not intend to

1  protect.  <u>See</u> H.R. Rep. No. 101-735, at 6949 (1990).

2         Here, the features defendant allegedly copied are

3  geared more toward the feel and "overall form" of the complex,

4  and not the pragmatic requirements of the project.  Indeed, the

5  whole purpose of plaintiff's specific layout was to "foster

6  community."  (SAC ¶ 97.)  With no additional constraints by

7  plaintiff's client and no relevant zoning restrictions, plaintiff

8  chose the spacing and composition of the buildings, parking, and

9  open space, the look of the roofs and trapezoidal shapes, the

10 number of units and arrangement of the structures, the use,

11 location, proportion and spacing of balconies, and the

12 configuration that placed small units on the ground floor and

13 larger two-story units on the combined second and third floors,

14 which plaintiff specifically describes as "unusual" (<u>id.</u> ¶ 102)

15 and which does not appear "essential or common" to a multifamily

16 residential development based on the information available to

17 this court.

18        Next, defendants cite <u>Gaito</u> for the proposition that

19 plaintiff's work constitutes "generalized notions of where to

20 place functional elements" and therefore do not merit copyright

21 protection.  (Mot. at 9.)  The similarities alleged by the <u>Gaito</u>

22 plaintiff included, among many others, "the placement of a new

23 park, parking garage, public plaza," "the flexibility for a

24 potential single larger tenant," "architecture that was light,

25 airy, transparent, made of glass with hints of traditional

26 materials," and a tower with a "slender profile."  <u>Id.</u>  The <u>Gaito</u>

27 court noted that its inquiry depended "on the level of

28 abstraction or generalization of the works being compared."  <u>Id.</u>

1   The features in Gaito, the court found, were too general and
2   abstract to warrant protection.  Id.

3        The features Platform attempts to protect here are
4   materially distinct from the generalized concepts the Gaito court
5   found unprotectible.  Indeed, it is unclear what constitutes
6   "light, airy, transparent" architecture.  Here, by contrast, it
7   is relatively clear what "smaller ground floor units, and larger
8   two-story units on the combined second and third floors" entails
9   and what the placement of each of the features looks like based
10  on the drawings.  Unlike in Gaito, the features plaintiff seeks
11  to protect are concrete and fixed.  Cf. Eales v. Envtl.
12  Lifestyles, Inc., 958 F.2d 876, 880 (9th Cir. 1992)
13  ("[Plaintiff's] plans laid out the location and sizes of numerous
14  features of model home # 3, and thus her ideas were 'fixed' in
15  tangible form.  That is all the copyright code requires.").  As
16  such, plaintiff's "detailed plans and drawings of the specific
17  building[s]" suffice to find that the allegedly copied features
18  are not generalized design concepts and are therefore
19  protectible.  See Nucor Corp. v. Tenn. Forging Steel Serv., Inc.,
20  476 F.2d 386, 390 (8th Cir. 1973) ("While the concept of a T-
21  shaped building is not entitled to copyright protection, detailed
22  plans and drawings of a specific building are.").

23        3.   Scope of Protection

24        "[T]he degree of overlap in original expression that is
25  required for the similarity to be substantial is determined by
26  the range of possible protectable expression."  Skidmore as Tr.
27  for Randy Craig Wolfe Tr. v. Zeppelin, 952 F.3d 1051, 1076 n.13
28  (9th Cir. 2020).  "If there's a wide range of expression,"

copyright protection is said to be "broad."  Mattel, 616 F.3d at

913-14.  Under broad protection, "a work will infringe if it's

'substantially similar' to the copyrighted work."  Id.  On the

other hand, [i]f there's only a narrow range of expression," then

copyright protection is "thin" and a work must be "virtually

identical" to infringe.  Id.  "Which end of the continuum a

particular work falls on is a call that must be made case by

case."  Apple Comput., 35 F.3d at 1447.

Defendants contend that plaintiff's work is entitled

only to a thin copyright.  While defendants' motion does not

clearly articulate a reason, defendants appear to argue that

because both works are multifamily residential complexes, the

type-of-building requirement limits the range of expression.

(See Mot. at 11, 23.)  For the following reasons, in the context

of this motion to dismiss, the court disagrees with defendant and

finds the allegations of the SAC sufficient to support the

inference that plaintiff's work is entitled to broad copyright

protection.

To illustrate the protection "continuum," the Ninth

Circuit has contrasted the "narrow range of expression" available

"to paint a red bouncy ball on blank canvas" with the "wide range

of expression" found in the "gazillions of ways to make an

aliens-attack movie."  Mattel, 616 F.3d 904, 914.  Other

decisions in this circuit are instructive here.  The Ninth

Circuit found that a glass-in-glass jellyfish sculpture is

entitled to thin protection because "clear glass, oblong shroud,

bright colors, proportion, vertical orientation, and stereotyped

jellyfish form" "are so commonplace in glass-in-glass sculpture

17

and so typical of jellyfish physiology." Satava v. Lowry, 323
F.3d 805, 812 (9th Cir. 2003); see also Feist, 499 U.S. at 363
(noting that the alphabetical "coordination and arrangement" of
phone numbers in a directory "is not only unoriginal, it is
practically inevitable").  Further, another district court found
that a tunic with lace accents is entitled to thin protection
because, although "lace along the hemline, upper back, bodice
area, and moustache area" were commonplace, the lace depiction of
stems and leaves on the tunic established "some small amount of
creativity beyond the standard combination of standard elements."
Express, LLC v. Fetish Grp., Inc., 424 F. Supp. 2d 1211, 1227
(C.D. Cal. 2006).

On the "broad" side of the spectrum, the Ninth Circuit
found a Marvin Gaye song was "not limited to only thin copyright
protection" because, unlike glass-in-glass jellyfish sculptures,
"[m]usic . . . is not capable of ready classification into only
five or six constituent elements," but is instead "comprised of a
large array of elements, some combination of which is protectable
by copyright." Williams, 895 F.3d at 1120.  Similarly, the Ninth
Circuit found that a photographer's picture of a basketball
player attempting to dunk a basketball was entitled to "broad"
protection because the photographer's "creative choices . . .
resulted in a photo with many non-standard elements."
Rentmeester, 883 F.3d at 1121.

Here, at least as it appears from the allegations of
the SAC, the range of expression is broad.  Plaintiff has alleged
that the Property was "a blank slate" and, as discussed above,
the court cannot infer that the clients requested anything beyond

18

1    a multifamily residential complex.  Plaintiff submitted to this
2    court four other concept sketches that drastically vary the
3    placement and number of buildings, parking spaces, number of
4    units, and the configuration of rooms within the buildings.  (See
5    Mot. at 13-14.)  These features, along with the angles of the
6    roof and the shapes of walkways and landscape areas, appear to
7    give the architects a broad possibility of expression.

8          Defendant is correct that the particular architectural
9    type can substantially limit a range of expression.  See Howard
10   v. Sterchi, 974 F.2d 1272, 1276 (11th Cir. 1992) (evaluating
11   "country style frame houses and . . . houses built with logs," a
12   style that requires "that only square angles be used" such that
13   "similarities in the general layout of rooms can easily occur
14   innocently").  The court cannot assume, however, that all cases
15   involving a certain architectural type give rise to only thin
16   copyright protection, and defendants cite no authority for that
17   proposition.  Notably, the cases defendants rely on decided
18   motions for summary judgment, not motions to dismiss, so
19   defendants in those cases substantiated their arguments with
20   evidence.  See id.; Logan Developers, Inc. v. Heritage Bldgs.,
21   Inc., No. 7:12-CV-323-F, 2014 WL 2547085, at *4 (E.D.N.C. June 5,
22   2014).  In Logan Developers, for example, defendants had compiled
23   examples of the allegedly copied features being used extensively
24   in other architectural models.  Id. at *7.  Based on those
25   compilations, the court concluded that certain features were
26   "standard."  Id.  Further, the court had either previously found,
27   or assumed, that plaintiff "employ[ed] a standard architectural
28   style used by architects and builders throughout the country."

1   Id.  This court is not privy to similar information and cannot

2   reasonably conclude that any given feature allegedly copied is a

3   standard feature in multifamily residential complexes, and

4   therefore unprotectable, as a matter of law.

5          Given the minimal restrictions on expression and

6   plaintiff's alternative concept sketches showing that many, if

7   not all, of the allegedly copied features are optional,

8   adjustable, and/or the result of the architect's creative

9   choices, it appears from the information available to this court

10  that plaintiff's work is more like a creatively arranged

11  photograph than a glass-in-glass jellyfish structure, and is

12  therefore entitled to broad protection.

13              4.   Whether the Works are Substantially Similar

14         The court now turns to whether plaintiff has plausibly

15  alleged that its plan drawings are substantially similar to

16  defendants' under the extrinsic test.  The Ninth Circuit does

17  "not have a well-defined standard for assessing when similarity

18  in selection and arrangement becomes 'substantial,' and . . . no

19  hard-and-fast rule could be devised to guide determinations that

20  will necessarily turn on the unique facts of each case."

21  Rentmeester, 883 F.3d at 1121.  The court thus evaluates whether

22  the elements at issue are "similar enough that 'the ordinary

23  observer, unless he set out to detect the disparities, would be

24  disposed to overlook them.'"  Id.

25         The court concludes that the complaint plausibly

26  alleges that the plan drawings are substantially similar.  Judges

27  are not trained architects.  Without the benefit of some expert

28  testimony, on motions to dismiss, courts must rely on the

                                  20

impressions a layperson would draw from comparing the allegedly
protected drawings with the allegedly infringing ones.  Defense
counsel's arguments at the hearing in many respects presumed a
knowledge of architecture which a judge cannot be expected to
have, and indeed, which would be improper for a judge to draw
upon if he did have that knowledge.  Comparing images from both
parties, the court agrees with plaintiff that the overall form
and proportion of the buildings appear identical, as does the
arrangement and composition of spaces and elements.  The size and
shape of the open areas and the trapezoidal shapes of the
walkways also appear identical.  (See Opp'n at 20 (Docket No.
41).)  While defendants are correct that the façades of the
buildings are not identical, from the side and front elevation of
the buildings, the roof angles, as well as the placement of
balconies, staircases, and some of the windows, appear, as
plaintiff alleges, largely indistinguishable.  (See Reply at 4
(Docket No. 42).)

        In sum, although evidence developed in later stages,
including expert evidence on the qualitative weight of the
alleged similarities, could lead the court to a contrary
conclusion, it is plausible at this stage of the proceeding that
defendant did not produce a design "unmistakably different from
[plaintiff's plan drawings] in material details."  See
Rentmeester, 883 F.3d at 1122.  An ordinary observer, for
example, could overlook the different colors or placement of some
of the windows, when the layout of the entire complex and
significant portions of the buildings, including most of the
façade and the interior distribution of units is virtually

21

1  identical to those created by plaintiff.  Cf. Zindel as Tr. for

2  David Zindel Tr. v. Fox Searchlight Pictures, Inc., No. 18-56087,

3  2020 WL 3412252, at *2 (9th Cir. June 22, 2020) (denying motion

4  to dismiss where "additional evidence, including expert

5  testimony, would aid in the objective literary analysis needed to

6  determine the extent and qualitative importance of the

7  similarities that [plaintiff] identified").  Plaintiff has

8  therefore plausibly alleged substantial similarity under the

9  extrinsic test and is "entitled to offer evidence" in support of

10  his claims.  See Gaito, 602 F.3d 57, 65 (2d Cir. 2010).

11      B.  Copying by the Klutnick Defendants

12          Defendant argues that plaintiff fails to allege

13  infringement by the Klutnick defendants because all allegations

14  related to the Klutnick defendants are about the phase II plan

15  drawings.  Because plaintiff's argument on infringement relates

16  only to the phase I plan drawings, defendants continue, plaintiff

17  has not properly pleaded substantial similarity between the phase

18  II plans and plaintiff's plans.

19          The court agrees with defendants.  As previously

20  discussed, plaintiff has the burden to identify which concrete

21  elements are similar.  Express, 424 F. Supp. 2d at 1228.

22  Plaintiff alleges only that "[t]he phase two plans incorporated

23  and included the phase one designs based on plaintiff's Plan

24  Drawings."  (SAC ¶ 82.)  Based solely on this allegation, the

25  degree of incorporation -- including the specific elements the

26  Klutnick defendants allegedly copied -- is not evident from the

27  face of the complaint.  Indeed, upon comparison of the parties'

28  plan drawings, the court cannot properly compare the images

1  because phase I appears greyed-out or not even illustrated on the

2  phase II plans.  (See Mot. at 18.)  The alleged similarities

3  between the two designs need not be extensive to establish the

4  copying component.  Rentmeester, 883 F.3d at 1117.  The court,

5  however, cannot simply infer similarities where the SAC lacks a

6  description and explanation of the phase II plans.

7  Further, defendants allege that the phase II plans include a mix

8  of 5-plex and 10-plex units.  (Id. at 17.)  These changes could

9  affect the "overall form" of the complex and whether the designs

10  are substantially similar.  Accordingly, because all allegations

11  relating to the Klutnick defendants concern phase II, and because

12  plaintiff has not identified the features allegedly copied in the

13  phase II designs, plaintiff has failed to properly plead

14  copyright infringement against the Klutnick defendants.

15       IT IS THEREFORE ORDERED that defendants' motion to

16  dismiss (Docket No. 40) be, and the same hereby is, GRANTED as to

17  defendants Jonathan Klutnick and James Klutnick.

18       IT IS FURTHER ORDERED that defendants' motion to

19  dismiss (Docket No. 40) be, and the same hereby is, DENIED as to

20  all other defendants.

21       Plaintiff is given 20 days from the date this Order is

22  filed to file a Third Amended Complaint, if it can do so

23  consistent with this Order.

24  Dated:  August 18, 2020

25

WILLIAM B. SHUBB
26  UNITED STATES DISTRICT JUDGE

27

28